# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **LATOYA RENEE HYPOLITE** | * | **CIVIL ACTION NO. 09-1506** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Latoya Renee Hypolite, born August 10, 1982, filed an application for supplemental security income payments on July 23, 2007, alleging disability since April 2, 2001, due to obesity, anxiety, and depression.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. Clinton Young dated October 23, 2006 to December 6, 2006**. Claimant complained of being depressed and unable to sleep. (Tr. 131-32). She was prescribed Lexapro.

**(2) Consultative Examination by Dr. Kenneth A. Ritter dated September 26, 2007**. Claimant complained of anxiety and depression for the past year, with improvement on medications, and a splenectomy in 2001. (Tr. 145). Her medications included Cymbalta, Trileptal, and Trazodone. She also reported feeling light-headed and dizzy and having headaches occasionally.

On examination, claimant was massively obese at 5 feet 5 inches tall and 344 pounds. (Tr. 146). She seemed very normal mentally. Her blood pressure was 140/96.

Claimant had no ankle swelling, and normal gait and station. Range of motion of upper and lower extremities was normal, limited only by her obesity. Neurologically, she was intact.

Dr. Ritter's impression was morbid obesity and a history of chronic anxiety and depression, for which she was currently under therapy. (Tr. 147).

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter found that claimant could lift/carry 25 to 35 pounds occasionally and 10 to 25 pounds frequently. (Tr. 148). She could stand/walk for four to six hours in an 8-hour workday, with one to two hours uninterrupted. Sitting was not affected by her impairment. She could rarely climb, knee, or crouch; occasionally stoop and crawl, and frequently balance. Dr. Ritter concluded that claimant seemed to be limited only by her obesity. (Tr. 149).

**(3) Psychiatric Review Technique dated October 24, 2007**. Judith Levy, Ph.D., assessed claimant for affective disorders, finding that her impairment of depression was not severe. (Tr. 150, 153). Dr. Levy determined that claimant had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 160). She had no episodes of decompensation.

**(4) Records from Center of Psychiatric and Addictive Medicine dated April 16, 2007 to September 29, 2008**. On April 16, 2007, claimant reported that her medication was not helping. (Tr. 174). She had stopped taking Cymbalta because it was keeping her up at night. She continued to report anxiety. Her Cymbalta was increased, and Trazodone was added.

On August 20, 2007, claimant reported that she had not been taking medication, and was not motivated to work on herself. (Tr. 173). She stated that she would start being more compliant. She reported fewer crying spells and less anxiety.

On September 18, 2007, claimant reported feeling less depressed with the Cymbalta, but her anxiety, agitation, and mood swings continued to worsen. (Tr. 172). She still complained of a problem with focus and concentration. She was prescribed Trileptal, Cymbalta, and Trazadone.

On October 29, 2007, claimant reported that she was doing well. (Tr. 171). She stated that the Trileptal had calmed her, that the Cymbalta "does wonders," and that she no longer felt depressed.

On November 27, 2007, claimant was not doing very well. (Tr. 170). She reported auditory hallucinations. She was not sleeping. She was prescribed Risperdal along with her other medications.

On December 20, 2007, claimant was better, but appeared distracted. (Tr. 169). She complained of depression, crying spells, hypersomnia, and anxiety and panic in social settings. She maintained compliance. Her medications were increased.

On January 29, 2008, claimant reported that Risperdal had handled the symptoms of her auditory hallucinations. (Tr. 165). She reported crying at times and becoming very anxious. She was attempting to exercise and lose weight. Her Cymbalta was increased.

**(5) Records from Our Lady of Lourdes dated November 7, 2008 to January 5, 2009**. Claimant was evaluated for chronic fatigue and daytime sleepiness. (Tr. 176). She was 5 feet 6 inches tall, and weighed 344 pounds. (Tr. 177). Her BMI was 54.

A polysomnography report revealed that claimant had mild obstructive sleep apnea syndrome with an elevated Epworth Sleepiness Scale totalling an 11. (Tr. 180). Dr. Matthew Abraham recommended titration night polysomnogram, which was performed on January 5, 2009. (Tr. 181-82). With the treatment, her overall arousal index dropped from 20 events an hour to less than one event per hour.

**(6) Claimant's Administrative Hearing Testimony**. At the hearing on January 16, 2009, claimant was 26 years old. (Tr. 22). She was a high school graduate, had attended technical college, and studied communication at LSU-E. She had worked for a short period at Wal-Mart as a stocker.

Regarding complaints, claimant testified that her mind was not stable, and that she did not communicate well with others because she got "nervous

breakdowns." (Tr. 23).  She also complained of becoming short-winded frequently.  Additionally, she complained of severe headaches and stomach problems, and sleep apnea.  (Tr. 23, 33).

Claimant testified that she had stopped working because she had crying spells at work due to depression.  (Tr. 26).  She reported that being around people bothered her.  (Tr. 26-27).  She also complained of being nervous, confused, and having trouble concentrating.  (Tr. 27, 33).

Claimant stated that she had started taking medications and getting counseling for her problems in 2000.  (Tr. 28).  She testified that she heard voices four or five times a day.  (Tr. 28-29, 31).  She reported that she had been to the emergency room for her crying spells in July.  (Tr. 29).

Regarding medications, claimant said that she heard voices two to three times per week since she had started taking them.  (Tr. 31).  She reported that the Trileptal and Cymbalta caused drowsiness   Claimant reported that she was 5 feet 6 inches tall, and weighed about 320 pounds.  (Tr. 24).  She testified that her weight had gone up since she had had her spleen removed.

As to activities, claimant testified that she reheated dinners in the microwave and swept sometimes.  (Tr. 35).  She put the garbage outside.  She shopped with her mother.

Additionally, claimant watched television. (Tr. 36). She had people come over to help her. She was able to take care of her personal grooming. She occasionally checked her e-mail on the computer. (Tr. 37).

Regarding restrictions, claimant testified that she could lift about 20 pounds. She could sit about an hour and a half before having to stand. She could walk about 15 to 20 minutes at a time. She reported that she had not had as many mental symptoms as she had the previous year. (Tr. 38).

**(7) Administrative Hearing Testimony of Claimant's Mother, Valencia Hypolite**. Ms. Hypolite testified that claimant had become worse over the last year and a half. (Tr. 39). She reported that claimant's nervousness and patience had become worse. She said that claimant did less work around the house and was less attentive. (Tr. 40). She stated that claimant could not be left alone because of her nervousness and spells. (Tr. 41).

**(8) Administrative Hearing Testimony of William Stampley, Vocational Expert ("VE")**. Mr. Stampley described claimant's past work as a stock clerk at Wal-Mart as heavy and semi-skilled. (Tr. 44). He noted that she had worked only a couple of months, which would not qualify as substantial gainful activity. (Tr. 45).

The ALJ posed a hypothetical in which he asked the VE to consider a claimant of the same age, education, and vocational background; who could perform light work, except that she could stand and walk only four to six hours in a workday, and could walk for only one to two hours at a time; could frequently balance, occasionally stoop and crawl, and rarely climb, kneel, or crouch. (Tr. 45). In response, Mr. Stampley opined that such claimant could work the sedentary jobs of final assembler, of which there were 621 positions statewide and 62,025 nationally, and addresser, of which there were 351 positions statewide and 25,954 nationally.

When the ALJ modified the hypothetical to assume a claimant who could perform only simple, repetitive work; make only simple work-related decisions, and should not work in close proximity to the general public, Mr. Stampley testified that such restrictions would not have any impact on the occupational base. (Tr. 46). However, when the ALJ added the restriction of no contact with the general public, the VE stated that such restriction would eliminate the final assembler position.

Additionally, the ALJ added the restriction of no working in close proximity to or in conjunction with a non-supervisory coworker. In response, the VE testified that such restriction would eliminate the addresser positions.

8

**(9) The ALJ's Findings**.  Claimant argues that the ALJ erred in assessing her residual functional capacity, as there was no medical basis to support the ALJ's mental limitations.

The ALJ evaluated claimant under Sections 12.04 and 12.06 of the Social Security listings.  20 CFR Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.  (Tr. 11).  Both of these sections require that claimant satisfy the "paragraph B" criteria.  To establish the paragraph B criteria, claimant's mental impairments must result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.

The ALJ determined that claimant had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace, and no episodes in decompensation.  (Tr. 11-12).  This finding is supported by the Psychiatric Review Technique form, in which Dr. Levy determined that claimant had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 160).  Thus, there is a medical basis to support the ALJ's

9

finding as to claimant's mental limitations.

Additionally, claimant argues that there was "*NO*" medical opinion from a treating or examining physician supporting the ALJ's assessment of her mental limitations. [rec. doc. 8, p. 3]. However, the records from the Center for Psychiatric & Addictive Medicine reflect that claimant's condition had improved with medication. On September 18, 2007, claimant reported feeling less depressed with Cymbalta. (Tr. 172). She stated on October 9, 2007, that the Trileptal had calmed her, the Cymbalta "does wonders," and she no longer felt depressed. (Tr. 171). On January 29, 2008, claimant reported that Risperdal had handled the symptoms of her auditory hallucinations. (Tr. 165). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Further, claimant argues that the ALJ should have sent her for a consultative psychological examination. [rec. doc. 8, p. 4]. Under some circumstances, a consultative examination is required to develop a full and fair record. *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987). The decision to require such an examination is discretionary. *Id*. In *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977), the Fifth Circuit stated "[t]o be very clear, 'full inquiry' does not

require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." (emphasis in original). A claimant must "raise a suspicion concerning such an impairment necessary to require the ALJ to order a consultative examination to discharge his duty of 'full inquiry' under 20 C.F.R. § 416.1444." *Pearson v. Bowen*, 866 F.2d 809, 812 (5th Cir. 1989) (*quoting Jones*, 829 F.2d at 526).

In this case, evidence from claimant's treating physician at the Center for Psychiatric and Addictive Medication was available to enable the administrative law judge to make the disability decision. Additionally, Dr. Levy determined that claimant's mental impairment was not severe. (Tr. 150). Further, neither of these doctors recommended a psychological review. *Haywood v. Sullivan*, 888 F.2d 1463, 1472 (5th Cir. 1989) (no consultative exam required where claimant's testimony did not indicate necessity for psychological review, nor did any doctors recommend such review). Given the evidence in the record, a consultative examination was not necessary.

Finally, claimant argues that, under *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), the ALJ was "***REQUIRED***" to recontact her treating source at the Center for Psychiatric and Addictive Medication and request information regarding her

mental limitations. [rec. doc. 8, p. 8]. SSA Regulation 20 C.F.R. § 404.1512(e) provides in pertinent part:

> (e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source *is inadequate* for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.

(emphasis added).

Here, the records from the Center for Psychiatric and Addictive Medication, as well as Dr. Levy's report, were adequate for the ALJ to determine claimant's mental limitations. In any event, claimant has not shown that she was prejudiced by the ALJ's failure to request additional information. *Newton*, 209 F.3d at 458. F.3d at 557. Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *Id*.

Claimant argues that she was prejudiced by the ALJ's failure to properly develop the record, as she was found not disabled based on the VE's testimony which was given in response to a defective hypothetical question. [rec. doc. 10, p. 5]. However, the record reflects that the ALJ incorporated her mental limitations in formulating the hypotheticals, including the ability to perform only simple, repetitive work, make only simple work-related decisions, and avoid working in

close proximity to the general public.  (Tr. 46).  As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant *recognized by the ALJ*, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference.  (emphasis added).  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE**

**DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION, 79 F.3D 1415 (5TH CIR. 1996)**.

Signed November 4, 2010, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE